# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 7, 2009          Decided July 24, 2009

No. 08-5406

ARKANSAS DAIRY COOPERATIVE ASSOCIATION, INC., ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01426-EGS)

*Benjamin F. Yale* argued the cause for appellants. With him
on the briefs was *Ryan K. Miltner*.

*John H. Vetne* and *Steven J. Rosenbaum* argued the cause
for appellees Agri-Mark, Inc., et al. and International Dairy
Foods Association. *Susan C. Silber* entered an appearance.

*Kelsi Brown Corkran*, Attorney, U.S. Department of Justice,
argued the cause for federal appellee. With her on the brief
were *Gregory G. Katsas*, Assistant Attorney General, and
*Michael S. Raab*, Attorney.

Before: ROGERS, TATEL and GRIFFITH, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

Opinion by *Circuit Judge* GRIFFITH dissenting in part and concurring in the judgment in part.

ROGERS, *Circuit Judge*: The Secretary of Agriculture establishes formulas to calculate the minimum prices that dairy handlers (processors, manufacturers, and distributors) must pay dairy producers (farmers) for milk. 7 U.S.C. § 608c(5). As part of those formulas, the Secretary sets "make allowances," which represent the costs to handlers in making certain forms of dairy products. In July 2008, the Secretary promulgated an interim rule amending milk marketing orders to increase make allowances, thereby reducing the minimum price paid to producers. Several producers and producer cooperatives challenged the increases principally on the ground that the Secretary had failed to determine and consider their food and fuel costs, which they maintain was required by the Agricultural Marketing Agreement Act ("AMAA"), 7 U.S.C. §§ 601, et seq. The district court ruled the producers lacked standing for want of a cause of action and, alternatively, denied their motion for a preliminary injunction. We hold that the producers have standing to challenge the interim rule under the Administrative Procedure Act and that the Secretary was obliged under the AMAA to consider their feed and fuel costs. Because the Secretary met that obligation, however, the producers fail to show likelihood of success on the merits, and we affirm the denial of injunctive relief. Furthermore, in reaching that decision, we hold certain of their claims must be dismissed.

## I.

The milk industry is highly regulated by the Secretary of Agriculture pursuant to the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. §§ 601, et seq. ("AMAA"). *See Hettinga*

*v. United States*, 560 F.3d 498, 501 (D.C. Cir. 2009). At least two factors create variations in the supply and demand of milk. First, the dairy market values milk more highly when sold in fluid form than when used for dairy products like butter or cheese, which would encourage dairy farmers in an unregulated market to sell their milk for the premium fluid prices. *See Zuber v. Allen*, 396 U.S. 168, 172-73 (1969). Second, cows naturally produce more milk in the spring and summer, such that a herd size sufficient to generate an adequate supply during the fall and winter generates surpluses during the spring and summer, leading to the potential for further price swings in an unregulated market. *See id.* To prevent "destabilizing competition" among dairy farmers as a result, Congress enacted the AMAA. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 341-42 (1984). "The 'essential purpose [of the scheme put in place by the AMAA is] to raise producer prices,' and thereby to ensure that the benefits and burdens of the milk market are fairly and proportionately shared by all dairy farmers." *Id.* (quoting S. REP. NO. 74-1011, at 3 (1935)).

The AMAA and its implementing regulations use two regulatory mechanisms: price fixing and payment pooling. The minimum prices that handlers must pay vary according to the end use of the milk, as categorized in four classes. *See* 7 U.S.C. § 608c(5)(A); 7 C.F.R. § 1000.40 (Class I milk is sold in fluid form, Class II milk is used to make ice cream, soft cheeses, and related products, Class III milk is used to produce harder cheeses, and Class IV milk is used to make butter and related products.). Instead of setting specific prices to be paid for each Class, the Secretary has established a formula by which the price for each Class is determined monthly based on the average nationwide wholesale prices from the previous month. *See* 7 C.F.R. § 1000.50; *Milk in the Northeast and Other Marketing Areas; Notice of Proposed Rulemaking and Tentative Partial Final Decision*, 73 Fed. Reg. 35,306, 35,308 (June 20, 2008)

(*"Tentative Decision"*). The formulas for Class III and IV milk are based on the nationwide average prices for butter, nonfat dry milk, cheese, and dry whey, minus a set dollar amount for each of those products, multiplied by a "yield factor." 7 C.F.R. § 1000.50)(*l*)-(o). Class I and II prices are derived from the Class III and IV prices but Class I prices are adjusted for the location of the handler so that handlers pay different prices in different geographic areas. *See* 7 C.F.R. §§ 1000.50, 1000.52. The amounts subtracted from the average sale prices of Class III and IV products, known in the milk industry as "make allowances" or "manufacturing allowances," are intended to represent the costs to the handlers of making the end dairy products from raw milk. *Tentative Decision*, 73 Fed. Reg. at 35,308. In essence, handlers retain from the average wholesale price the amount set by the make allowance and transfer the balance to producers.

The second major component of dairy market regulation is payment pooling. Under this system, handlers pay prices according to the end use of milk, but all the producers in a geographic area receive the same monthly average or "blended" price per unit of milk sold, regardless of the use to which their milk is put. *See* 7 U.S.C. § 608(c)(5)(B); 7 C.F.R. §§ 1000.70, 1000.76. This payment equalization is accomplished through the "producer settlement fund" into which handlers pay, or from which handlers withdraw, according to whether their blend-price payments to producers are less or greater than the end-use-value of the milk they have purchased. C.F.R. §§ 1000.70, 1000.76. Again, the effect of this regime is that handlers make payments which vary according to the market value of the milk they use (as reflected in minimum prices), while all producers in an area receive the same average, or blended, price per unit of milk.

Different geographic areas of the United States are regulated under slightly different conditions, although the formulas used to set prices of Class III and IV milk are the same

in all areas. *See* 7 C.F.R. § 1000.50. Each of eleven areas, generally known as a "marketing area" or "milk marketing area," is governed by a different "Order" of the Secretary. *See, e.g.*, 7 U.S.C. § 608c(5)(A); 7 C.F.R. § 1001.2. Before going into effect, the Secretary's orders must be approved by two-thirds of the producers or the producers of two-thirds of the milk volume in the affected area, as well as by the handlers of a majority of the milk volume in the area covered by the order, although the Secretary can put an order into effect without handler approval if the order is "the only practical means of advancing the interests of the producers." 7 U.S.C. § 608c(8)-(9).

Make allowances, unlike the wholesale prices used in the minimum price formulas for Class III and IV products, do not vary with market conditions. They are set as constants in a formula and can only be raised or lowered through a rulemaking. *Tentative Decision*, 73 Fed. Reg. at 35,323. Several events converged to shape the issues in the instant case. First, in January 2006, the Secretary issued notice of a hearing on a proposal in which the handler Agri-Mark advocated an increase in make allowances. *See Milk in the Northeast and Other Marketing Areas; Notice of Hearing on Proposed Amendments to Tentative Marketing Agreements and Orders*, 71 Fed. Reg. 545 (Jan. 5, 2006). In December 2006, after a hearing and the required producer approval, the Secretary promulgated an interim final rule increasing the make allowances. *See Milk in the Northeast and Other Marketing Areas; Interim Order Amending the Orders*, 71 Fed. Reg. 78,333 (Dec. 29, 2006). A number of producers sought an injunction in the district court for the Northern District of Ohio, on the ground that the Secretary had failed to consider their feed prices and feed supplies when adjusting the make allowance, as they argued was required by the AMAA, 7 U.S.C. § 608c(18), *infra* note 7. The district court set forth conflicting interpretations, noting, for example, that the

Sixth Circuit had held in *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1355 (6th Cir. 1994), that the statute and legislative history were ambiguous. The district court found it unnecessary to decide whether § 608c(18) required the Secretary to consider such feed costs when amending make allowances because the Secretary's final decision showed he had, in fact, "given [these factors] appropriate consideration" under the product-price formulas. *Bridgewater Dairy, LLC v. USDA,* No. 3:07-cv-104, 2007 WL 634059, at *4-6 (N.D. Ohio Feb. 22, 2007).

Second, in 2008 Congress amended the AMAA to require the Secretary, as "part of any hearing" to adjust make allowances, to "determine" and "consider" producers' feed and fuel costs.[1] *See* 2008 Act, Pub. L. 110-246, § 1504, 122 Stat at 1721-72 (codified at 7 U.S.C. § 608c(17)(G)), *see* page 22. The amendment addressed ambiguities in § 608c(18) noted by the district court in *Bridgewater Dairy*. Under the amendment, the requirement to consider producers' costs explicitly applied when the Secretary was adjusting make allowances, and the Secretary was required to consider recent price in determining producers' monthly costs in the market area.

Third, the Secretary, on June 20, 2008, after a series of hearings, proposed further increases in make allowances and changes in the butter fat yield factor used in Class III and Class

---

[1]  On May 22, and June 18, 2008, Congress enacted two statutes, together known as the Food, Conservation, and Energy Act of 2008, Pub. L. 110-234, 122 Stat. 923; Pub. L. No. 110-246, 122 Stat. 1651 ("2008 Act"). Section 1504 of Pub. L. No. 110-246, which contains the requirement relevant in the instant case, became effective on the earlier of its enactment or the enactment of "H.R. 2419 of the 110th Congress." *See* 2008 Act § 4(b), 122 Stat. at 1664. H.R. 2419, which became Pub. L. No. 110-234, was enacted earlier, on May 22, 2008. *See* 2008 Act, 122 Stat. at 923.

IV product-price formulas on an interim basis. *Tentative Decision*, 73 Fed. Reg. 35,323.[2] As relevant, the Secretary found that handlers' costs had increased since the make allowances were last set. *Id.* at 35,324. The Secretary pointed out that "because make allowances account for manufacturing costs in the Class III and Class IV price formulas but do not change as those costs change, increasing make allowances is the only reasonable way by which those increased costs can be recovered," *id.* at 35,323. The Secretary also cited testimony indicating that a 2006 study had attempted to correct the understatement of processing costs in a 2005 study used in the previous rulemaking, and the 2006 study showed the need to update make allowances to reflect changes in manufacturing costs. *Id*. at 35,309. The Secretary proposed increased make allowances for Classes III and IV based on national manufacturing cost averages. *Id.* at 35,325–26. In the course of the rulemaking, the Secretary addressed a number of objections from producers, including that make allowances were already set too high and that producers have also seen increased costs due to higher energy and feed costs. *Id.* at 35,324. The Secretary responded that objections based on producer costs "are not valid arguments for opposing how make allowance should be determined or what levels make allowances need to be," because current make allowances were not reflective of handlers' costs and, unlike producers' costs, could not be recaptured in the marketplace. *Id*.

After producer approval of the *Tentative Decision*, the Secretary promulgated an interim rule amending milk marketing

---

[2] The Secretary explained in promulgating an interim rule that "[a] separate decision [will address] the collection of manufacturing cost information, the use of an energy cost adjustor and providing for a cost add-on feature to Class III and Class IV product-pricing formulas . . . .." *Tentative Decision*, 73 Fed. Reg at 35,306.

orders to increase the make allowances. *See Milk in the Northeast and Other Marketing Areas; Interim Order Amending the Orders*, 73 Fed. Reg. 44,617 (July 31, 2008) ("*Interim Rule*"). The required majority of handlers did not approve, but the Secretary exercised his override authority on the ground that the *Interim Rule* was necessary to effect the policy of the AMAA of advancing producer interests. *Id.* at 44,618. Neither the *Tentative Decision* nor the *Interim Rule* explicitly addressed the requirements of the 2008 Act.

Two weeks later, appellant-producers sued the Department of Agriculture, seeking declaratory and injunctive relief on the ground that the *Interim Rule* was arbitrary, capricious, and contrary to law, not supported by substantial evidence, and constituted a denial of substantive due process. The producers premised the district court's jurisdiction on the AMAA, including the amendment in the 2008 Act, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq. They alleged that the *Interim Rule* would have an adverse "direct, penny for penny, impact on the prices" producers would receive for their milk, specifically that it would lead to a "permanent loss of income." Compl. ¶¶ 15-17, 26. Among other grounds, they argued the Secretary had failed to determine and consider their feed and fuel costs as required by the AMAA under §§ 608c(17)(G) and 608c(18). They also filed a motion for a temporary restraining order and/or preliminary injunction.

The district court ruled the producers lacked standing because the AMAA impliedly precluded APA review, and thus they had no cause of action. *Ark. Dairy Coop., Inc., v. USDA*, 576 F. Supp. 2d 147, 154 (D.D.C. 2008). Alternatively, the district court denied their motion for a preliminary injunction, assuming the motion was properly before it, on the grounds that the producers had little chance of success on the merits because § 608c(18) did not require the Secretary to consider feed and

fuel costs when adjusting a make allowance; the requirement in § 608c(17)(G) did not go into effect until after the hearing on proposals resulting in the Secretary's *Tentative Decision* had concluded; and the Secretary had in fact determined and considered producer costs by using product-pricing formulas that accounted for those factors. *Id.* at 156-60.

## II.

The producers appeal, *see* 28 U.S.C. § 1292(a)(1), contending they have demonstrated their entitlement to a preliminary injunction of the *Interim Rule*. They contend they have a judicially protectable right in the benefits guaranteed by the AMAA and that the Secretary failed to comply with § 608c(17)(G) mandating the determination and consideration of their feed and fuel costs in adjusting make allowances, and § 608c(18) mandating the consideration of the enumerated economic factors in each marketing area. They further contend they have demonstrated irreparable harm and that an injunction in their favor is in the public interest in preventing unauthorized administrative action and direct injury to them.

In deciding whether to grant a preliminary injunction, the district court must evaluate whether: (1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). This court "review[s] the district court's weighing of the preliminary injunction factors under the abuse of discretion standard, and its findings of fact under the clearly erroneous standard. To the extent the district court's decision hinges on questions of law, however, this court's review is essentially *de novo*." *Id.* at 1318 (citations and internal

quotations omitted).  There are three such questions here: (1) whether the producers have a cause of action under the APA and thus have standing; (2) if so, whether the Secretary's statutory obligations are as the producers contend; and (3) if so, whether the Secretary complied with those obligations in promulgating the *Interim Rule*.

The threshold issue is whether the producers have a cause of action by which they can challenge the *Interim Rule* amending the Secretary's milk marketing orders to increase make allowances.  Our inquiry here is not whether the producers have standing under Article III of the Constitution,  which is undisputed and clear, but whether Congress has provided for or precluded judicial review. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 96-97 (1998).

The AMAA provides for handlers to petition for judicial review of the Secretary's orders after exhausting their administrative remedies.[3]  No provision of the AMAA provides

---

[3]  Section 608(c)(15) provides:

> (A) Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that such order . . . is not in accordance with law and praying for a modification thereof or to be exempted therefrom.  He shall thereupon be given an opportunity for a hearing . . . .  After such hearing, the Secretary shall make a ruling upon the prayer of the petition which shall be final, if in accordance with law.

> (B) The District Court[s] . . . in any district in which such handled is an inhabitant, or has his principal place of business, are hereby vested with jurisdiction in equity to review such ruling . . . .

for judicial review by producers. However, the producers also bring their claims under the APA, which provides judicial review to persons "suffering legal wrong because of [final] agency action, or adversely affected or aggrieved by [final] agency action within the meaning of a relevant statute," 5 U.S.C. §§ 702, 704, except where such review precluded by statute, *id* § 701(a)(1). The Department and some intervenor producer-handlers maintain the AMAA is such a statute, relying on *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984). The district court agreed. *Ark. Dairy*, 576 F. Supp. 2d at 154-55. Such an approach, however, reads *Block* too broadly and *Stark v. Wickard*, 321 U.S. 288 (1944), on which the producers rely, too narrowly, and thus fails to conform to this court's precedent on producer standing.

In *Block*, individual milk consumers challenged a milk marketing order that had the effect of raising the price consumers would pay for reconstituted milk. *Id.* at 343-44. The Supreme Court held the consumers lacked standing to challenge the order. *Id.* at 352-53. The Court instructed that in determining whether a statute "precludes judicial review," a court must examine not only the statutory text, "but also . . . the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved," *id.* at 346, under a general presumption in favor of judicial review which "may be overcome by specific language or specific legislative history that is a reliable indicator of congressional intent," *id.* at 349. Employing this structural analysis, the Court focused on the fact that the AMAA explicitly provides handlers, but not consumers, a right to petition for review in court. The AMAA's "statutory scheme . . . [thus] makes . . . clear

---

7 U.S.C. § 608(c)(15).

Congress' intention to limit the classes entitled to participate in the development of market orders." *Id.* at 346.

Because the AMAA does not provide a right of judicial review to producers, the Department seizes on *Block* as precluding producer standing in a cause of action under the APA as well. However, this approach reads *Block* too broadly, for the Supreme Court did not concentrate simply on the presence or absence of an explicit right of appeal in the AMAA, but instead noted that in the "complex scheme" of the AMAA, there was no provision for consumer participation of any kind. *Id.* "The omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* Importantly, the Court contrasted this with the role of handlers and producers:

> The [AMAA] contemplates a cooperative venture among the Secretary, handlers, and producers the principal purposes of which are to raise the price of agricultural products and to establish an orderly system for marketing them. Handlers and producers — but not consumers — are entitled to participate in the adoption and retention of market orders. The [AMAA] provides for agreements among the Secretary, producers, and handlers, for hearings among them, and for votes by producers and handlers.

*Id.* at 346-47. In short, "[t]he structure of th[e] [AMAA] indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* at 347. Because the AMAA contemplates this active role for producers during the rulemaking process, they occupy a different status under the AMAA from that of consumers.

The Supreme Court's analysis of the purpose of the AMAA is also instructive. It observed that "preclusion of consumer suits will not threaten realization of the fundamental objectives of the statute" because "[h]andlers, like consumers, are interested in obtaining reliable supplies of milk at the cheapest possible prices." *Id.* at 352. It contrasted this alignment of consumer and handlers interests with the interests of producers, which would not be represented by handlers. *Id.* Because producer interests would otherwise go unvindicated, the Court noted, courts have found suits by producers "necessary to ensure achievement of the [AMAA]'s most fundamental objectives — to wit, the protection of the producers of milk and milk products." *Id. See also Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, 1257 (D.C. Cir. 1983) (Scalia, J., dissenting) ("The direct beneficiaries of milk marketing orders under the [AMAA] are milk producers. Even before adoption of the APA, the courts found a congressional intent to permit them to sue. But where, as in the present case, [consumers'] grievance is entirely derivative of [that of handlers,] then the statutory review provision does suggest that the more remote group was not meant to have standing to sue."). "The right of judicial review is ordinarily inferred where congressional intent to protect the interests of the class of which the plaintiff is a member can be found; in such cases, unless members of the protected class may have judicial review the statutory objectives might not be realized." *Barlow v. Collins*, 397 U.S. 159, 167 (1970). Unlike the consumers whose interests were coextensive with those of handlers in *Block*, 467 U.S. at 532, the producers are the only party with an interest in ensuring that the price paid them is not reduced by too large a make allowance paid to handlers.

Admittedly, some discussion in *Block* seems to sweep broadly enough to exclude producer challenges to milk marketing orders. The Supreme Court stated, for example, "[W]e think it clear that Congress intended that judicial review

of market[ing] orders issued under the [AMAA] *ordinarily* be confined to suits brought by handlers in accordance with 7 U.S.C. § 608c(15)." *Id.* at 348 (emphasis added). In context, the Court's primary concern seems to have been that allowing consumer suits would permit a handler to bring suit — either in its own capacity as a consumer or through other consumers with whom its interests were aligned — without first exhausting the administrative remedy required by § 608c(15). *See id.* Because producer and handler interests are normally adverse, however, there is no such objection to producer suits because handlers "ordinarily" could not induce producers to sue on their behalf.[4]

Furthermore, reading *Block* broadly to bar producer suits like the instant one would leave no room for the Supreme Court's holding in *Stark* , 321 U.S. at 302, 311, that the district court had jurisdiction over producers' challenge to a milk marketing order claimed to exceed the Secretary's powers. Like the *Interim Rule*, the milk marketing order challenged in *Stark* computed the blend price owed to producers by first computing the use value of milk purchased by handlers (based on the minimum price and quantity for the classes of milk used), and then computing blend price as a weighted average of that use value. *Id.* at 300. The order directed that certain "adjustments" be deducted from the use value before computing the blend price. *Id.* at 301. All of these adjustments were eventually paid to producers, except for a "cooperative adjustment," which was a set amount per hundredweight of milk paid to producer cooperatives. *Id.* Because this adjustment was

---

[4] In fact, this court has anticipated and resolved any such risk. Where a single entity acts as a vertically-integrated "producer-handler," it must exhaust before bringing suit in its capacity as a handler, but not when bringing suit in its capacity as a producer. *See Hettinga,* 560 F.3d at 504; *Edaleen Dairy, LLC, v. Johanns*, 467 F.3d 778, 783 (D.C. Cir. 2007).

deducted from the total use value before the blend price was computed, the adjustment "reduce[d] *pro tanto* the amount actually received by the producers for their milk." *Id.* at 302. Producers who were not members of cooperatives challenged the order on the grounds that the AMAA did not authorize the Secretary to deduct a sum from the minimum price to be paid only to cooperatives. *Id.* at 301. Although no statute provided an explicit cause of action and the APA had not yet been enacted, the Supreme Court held that "[t]he authority for a judicial examination of the validity of the Secretary's action is found in the existence of courts and the intent of Congress as deduced from the statutes and precedents." *Id.* at 307-08. In particular, the Court concluded that the producers had a "definite and personal claim" because the AMAA assured them "minimum prices" for milk, in this instance the prices set by the use value computations without subtractions for cooperatives. *Id.* at 305. In other words, in a milk marketing order scheme like the one underlying the rule challenged in the instant case, producers had standing to obtain judicial review of an order that reduced the amount they would receive for their milk.

This court reaffirmed the standing of producers to challenge certain milk marketing orders in *Blair v. Freeman*, 370 F.2d 229 (D.C. Cir. 1966). In *Blair*, a group of Pennsylvania producers who sold milk into the New York-New Jersey Milk Marketing Area challenged an order that provided a price increase for producers located close to New York City, but not for those located farther away. *Id.* at 234. This selective price increase was paid out of the producer settlement fund, and had the effect of reducing the pool of money to be divided as the blend price paid to all producers. *Id.* at 234 n.15; *see also Milk in New York Metropolitan Marketing Area and in Northern New Jersey: Decision with Respect to Proposed Amendments to Tentative Marketing Agreement and to Order*, 22 Fed. Reg. 4194, 4212-14 (June 14, 1957). Because this practice, like that challenged in

*Stark*, reduced "*pro tanto* the amount actually received" by the producers who brought the suit, this court held the producers had "standing to invoke the protection of equity to insure that their statutory right to minimum price protection is not being improperly diminished" by an order which "exceeded the statutory power of the Secretary." *Blair*, 370 F.2d at 234 & n.15 (citing *Stark*, 321 U.S. at 290).

The parallels to the instant case are apparent. As in *Stark* and *Blair*, the producers challenge a rule deducting funds from the value of milk before calculating the blend price guaranteed to producers, thus reducing, "dollar for dollar," the minimum price producers are guaranteed for their milk products. Also like the producers in *Stark* and *Blair*, the producers allege not that the Secretary has misjudged what prices are appropriate, but rather that the Secretary's *Interim Rule* deducts funds, and thus reduces the blend price, in a way the Secretary is not authorized to do, namely by reducing the blend price without considering factors as he was statutorily obliged to address. As the Supreme Court stated in *Stark*, "It is because every dollar of deduction comes from the producer that he may challenge the use of the fund. The [producers'] complaint is not that their blended price is too low, but that the blended price has been reduced by a misapplication of money deducted from the producers' minimum price," i.e., from the price computed based on the use value of the milk sold. 321 U.S. at 308-09.

The Department, and some intervenor handlers, suggest that *Stark* and *Blair* are distinguishable because the money in the instant case is diverted from the producers at a different point in the payment stream than occurred in *Stark* and *Blair*. In those cases, the money was diverted from the producer settlement fund after the value of milk was calculated and after the handlers had paid for it, but before the blend price was calculated. Here, the funds are also deducted before the blend price is calculated,

but, by contrast, under the *Interim Rule* the deduction occurs in the process of calculating the price owed by handlers, before the handlers pay the producers or the producer settlement fund. The importance of this difference, which the district court also emphasized, eludes us. As in *Stark* and *Blair*, the producers claim that the "minimum prices" they are owed, i.e., the value of the milk, is being reduced unlawfully under the *Interim Rule*. It is this interest which the Supreme Court in *Stark* held sufficiently "definite and personal" to permit the producers to challenge its diminution. 321 U.S. at 305. Although the producers in *Stark* and *Blair* complained of diminution of the blend price through deductions from the producer settlement fund, there is no indication that either opinion hinged on that fact. Certainly there is no indication that a diminution at a different point in the payment-calculation chain would be an alleged wrong that the APA could not address because the AMAA had impliedly precluded such a suit.

It is also unavailing for the intervenor handlers and our dissenting colleague to suggest that because the AMAA requires approval by the majority of producers before the Secretary's orders go into effect, the AMAA must be read impliedly to preclude all other avenues of redress, including suits alleging an order is not in accordance with law.

> [W]here as here the issue is statutory power to make the deduction required by the Order, . . . a mere hearing or opportunity to vote cannot protect minority producers against unlawful exactions which might be voted upon them by majorities. It can hardly be said that opportunity to be heard on matters within the Secretary's discretion would foreclose an attack on the inclusion in the Order of provisions entirely outside of the Secretary's delegated powers.

*Stark*, 321 U.S. at 307.[5]

All but one of the circuit courts of appeal to have considered the issue have also concluded that producers can challenge milk marketing orders under the APA, even where the challenge is not premised on a deduction from the producer settlement fund. The Sixth Circuit reasoned that "[T]he purpose of the statutory scheme — raising the price that milk producers receive for their milk — would be undermined if producers could not challenge regulations of this type in federal court . . . ." *Farmers Union Milk Mktg. Coop. v. Yeutter*, 930 F.2d 466, 467 (6th Cir. 1991). Similarly, the Seventh Circuit held that producers, as "the very group the milk marketing law seeks to protect," "can seek

---

[5] The dissent would read the AMAA to preclude all producer suits that do not explicitly allege that an order unfairly advantages some producers at the expense of others, on the theory that producers' right to vote on orders adequately protects them in other situations. The effect of this regime would be that when two-thirds of producers approve an order that is contrary to law but treats all producers alike, the remaining third of producers must submit to that order without judicial redress. There is no evidence Congress intended such a regime, and no court has advanced such a theory before. Instead, the quotation from *Stark,* especially the conclusion in the final sentence, evidences a focus on ensuring a judicial forum for producers who allege they are harmed by an illegal order, regardless of their right to vote on that order. *See Alto Dairy v. Veneman,* 336 F.3d 560, 565 (7th Cir. 2003) (describing *Stark* as holding producers "could challenge . . . an order if in issuing it the Agriculture Department had exceeded the authority delegated to it by Congress and in doing so had infringed a definite right of the producer"). Similarly, in *Block* the Supreme Court states that judicial review of producer suits is necessary to ensure the AMAA's "fundamental objectives" of "the protection of producers," 467 U.S. at 351, without limiting this to the protection of some producers from an abusive majority of other producers. This limitation is read into *Block* by the dissent. Dis. Op. at 4.

judicial review of milk marketing orders that pinch them," *Alto Dairy v. Veneman*, 336 F.3d 560, 566, 569 (7th Cir. 2003). *See Dairylea Coop., Inc. v. Butz*, 504 F.2d 80, 83 (2d Cir. 1974); *Suntex Dairy v. Bergland*, 591 F.2d 1063, 1067 (5th Cir. 1979); *Minn. Milk Producers Assoc. v. Madigan*, 956 F.2d 816, 818 (8th Cir. 1992).[6] Only the Ninth Circuit has read *Block* as broadly as the Department urges, stating in *Pescosolido v. Block*, 765 F.2d 827, 831 (9th Cir. 1985), that "We believe that [*Block*] can be interpreted generally to foreclose judicial review sought by anyone other than handlers . . . ." In two recent cases addressing handler exhaustion of administrative remedies, this court has arguably assumed, without directly addressing the issue, that producers can bring suits challenging the Secretary's orders. *See Hettinga*, 560 F.3d at 503-504; *Edaleen Dairy*, 467 F.3d at 783; *supra* note 4.

It is true, as the Department and intervenor handlers point out, that a decade before *Blair*, in *Benson v. Schofield*, 236 F.2d

---

[6] As with *Stark* and *Block*, the dissent limits the holdings of other circuits to fit a new line in the sand. In *Alto Diary*, for example, a group of producers made the choice not to participate in a rulemaking and later complained that the promulgated rule differed so greatly from the proposal that they did not receive adequate notice. 336 F.3d at 570. They alleged no systemic failure in the referendum process nor oppression by a producer majority, only a procedural shortcoming. In those cases that did involve disputes among producers, nothing in the courts' opinions indicates that the determination of whether producers had a cause of action hinged on that fact. *See, e.g., Minn. Milk Producers*, 956 F.2d at 817 (finding standing for producers alleging violation of the Secretary's obligation under AMAA); *Farmers Union*, 930 F.2d at 473 ("The purpose of the AMAA strongly favors judicial review of aspects of market orders that concern producers in lawsuits brought by producers."); *Dairylea Coop.*, 504 F.2d at 83 ("The Supreme Court . . . has held that this silence [as to judicial remedies] does not bar producers . . . .").

719 (D.C. Cir. 1956), this court affirmed the dismissal of a complaint by dairy producer-handlers challenging a milk marketing order that extended the limits of a milk marketing area. In that case, the court addressed the merits of the claims that the rulemaking was procedurally defective for lack of notice to producers and an opportunity for them to attend hearings, *id.* at 722-23, but further concluded they were not seeking to vindicate "a statutory privilege protected by judicial remedies," and thus "lack[ed] a legal right." *Id.* at 723 (citing *Stark*, 321 U.S. at 306). *Benson* is inapposite for a number of reasons. First, in *Benson* the court was not addressing a diminution of producers' statutorily-guaranteed blend prices, as in *Stark*, *Blair*, and the instant case, but rather an order that increased the boundaries of a marketing area to cover a greater number of handlers, an action the court held did not infringe any statutory right possessed by the producers because only handlers were affected, *id.* at 723. Second, the suit in *Benson* was not brought under the APA, and the court did not hold that the AMAA impliedly precluded producer suits, only that the AMAA did not itself provide a cause of action for the claimed grievance regarding a marketing area. Given also that *Blair*, which presented a situation more analogous to the instant case, was decided after *Benson* and acknowledged a cause of action for producers challenging orders as beyond the Secretary's power, *Benson* is easily distinguishable.

Accordingly, we hold that the producers can bring suit under the APA to challenge the *Interim Rule*, which directly affects their blend prices through increased make allowances, even though the milk marketing orders will not directly affect the producer settlement fund. The producers are aggrieved, within the meaning of the APA, by the alleged diminution of their personal rights secured under the AMAA, the *Interim Rule* they challenge constitutes final agency action, and they seek non-monetary injunctive relief. 5 U.S.C. §§ 702, 704. We therefore

turn to the merits of the producers' contention that the Secretary was statutorily required to determine and consider producers' feed and fuel costs in seeking to change a make allowance and failed to do so.

### III.

In seeking to enjoin the *Interim Rule* on the ground that the Secretary failed to carry out mandated responsibilities, the producers rely on AMAA §§ 608c(18), enacted in 1937, and on § 608c(17)(G), the 2008 Act amendment to the AMAA.

Section 608c(18) requires the Secretary, in initially setting dairy prices, to ensure that those prices reflect a variety of factors. 7 U.S.C. § 608c(18).[7] The parties disagree about which

---

[7] Section 608(c)(18), "Milk prices," provides in relevant part:

The Secretary of Agriculture, *prior to* prescribing any term in any marketing agreement or order, or amendment thereto, relating to milk or its products, if such term is to fix minimum prices to be paid to producers . . ., or prior to modifying the price fixed in any such terms, shall ascertain the parity prices of such commodities. The prices . . . shall . . . be adjusted to reflect the price of feeds, the available supplies of feeds, and other economic conditions, which affect market supply and demand for milk or its products in the market area to which the contemplated marketing agreement, or, or amendment relates. Whenever the Secretary finds, upon the basis of the evidence adduced at the hearing required by section 608b . . . that the parity prices of such commodities are not reasonable in view of the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk and its products in the marketing area to which the contemplated agreement, order, or amendment relates, he shall fix such pries as he finds will reflect such

of § 608c(18)'s requirements apply to rulemakings like this one, in which the Secretary readjusts rather than initially sets prices. We need not decide the issue because even if all of § 608c(18)'s requirements apply, they impose no obligation relevant here beyond that imposed by § 608c(17)(G).

Section 608c(17)(G) provides:

> Monthly feed and fuel costs for make allowances
>
> As part of *any hearing* to adjust make allowances under marketing orders commencing prior to September 30, 2012, the Secretary shall–
>
> (i) determine the average monthly prices of feed and fuel incurred by dairy producers in the *relevant* marketing area;
>
> (ii) consider the *most recent monthly* feed and fuel *price data available*; and
>
> (iii) consider those prices in determining whether or not to adjust make allowances.

---

factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest.  *Thereafter*, as the Secretary finds necessary on account of changed circumstances, he shall after due notice and opportunity for a hearing, make adjustments in such prices.

7 U.S.C. § 608(c)(18) (emphasis added).  The "parity price" of commodities is a statistical measure of prices adjusted for certain historical and efficiency factors. *Id*. § 1301(a)(1).  In the *Interim Rule* the Secretary found that parity prices were not reasonable in view of the statutory factors.  73 Fed. Reg. at 44,613 [JA 122/2].

7 U.S.C. § 608c(17)(G) (emphasis added). The 2008 amendment to the AMAA thus plainly requires the Secretary, in adjusting make allowances, to consider producers' feed and fuel prices, and thus there is no occasion to decide if § 608c(18) also imposes such obligations.

The Department maintains the 2008 Act did not apply to the *Interim Rule* because the amendment to the AMAA took effect too late. The 2008 Act went into effect May 22, 2008, *see supra* note 1, and directs the Secretary to determine and consider certain costs "[a]s part of any hearing to adjust make allowances," 7 U.S.C. § 608(c)(17)(G). The final public hearing on the proposed order took place almost a year earlier, on July 11, 2007. Because the 2008 Act was not then in effect, the Department concludes the Secretary was under no obligation to determine and consider producers' costs "as part of" that hearing. This is true only if, as the Department maintains, the meaning of the word "hearing" in § 608c(17)(G) can only refer to "that part of the proceeding which involves the submission of evidence," as the Department's regulations in effect now and at the time of enactment of the 2008 Act provide. *See* 7 C.F.R. § 900.2(h). Such a definition, however, is incompatible with the plain text of § 608c(17)(G), which requires the Secretary "as part of any hearing" to "determine" feed and fuel costs and to "consider" those costs when changing make allowances. If the word "hearing" referred only to the proceeding in which an Administrative Law Judge ("ALJ") receives evidence, then Congress' directions to the Secretary would make no sense. The Secretary can only "determine" costs after the evidence has been received. By then, according to the Department's reading of the 2008 Act, it is too late because the "hearing" has already concluded. Likewise, the Secretary could not "consider" costs "as part of [the] hearing" as the Department defines it because those costs would not yet have been determined. It would be impossible to comply with the 2008 Act because the Secretary would need to do at once steps

that logically must follow sequentially. The Department's regulations also make clear that the Secretary reaches decisions on the basis of the completed evidentiary record. *See* 7 C.F.R. § 900.13a ("After due consideration of the record the Secretary shall render a decision.").

In context, the term "hearing" in § 608c(17)(G) must mean more than the proceeding during which evidence is submitted to the Secretary. It must also include the portions of the rulemaking process during which the Secretary analyzes the evidence in the rulemaking record and reaches conclusions, because only then can the Secretary "determine" and "consider" costs. Indeed, another provision of the 2008 Act amendment to the AMAA seems to contemplate a broader understanding of "hearing," including within "Hearing timeframes" events that take place after the close of an evidentiary hearing, such as the submission of post-hearing briefs. *See* 7 U.S.C. § 608c(17)(C). This interpretation of "hearing" admittedly is at odds with the Department's regulation, *see* 7 C.F.R. § 900.2(h), and courts "generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184 (1988); *see United States v. Wilson*, 290 F.3d 347, 357 (D.C. Cir. 2002). However, as the Supreme Court observed in *Block* in regard to a different canon of construction, the presumption that Congress was aware of the background law "is just that — a presumption[, which,] like all presumptions used in interpreting statutes, may be overcome by specific language . . . that is a reliable indicator of congressional intent." 467 U.S. at 349. Here, the presumption that Congress was aware of and incorporated the Department's definition of "hearing" would lead to the absurd result that Congress intended to impose a requirement with which the Secretary could not comply. Courts, "in interpreting the words of a statute, [have] 'some scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of

that meaning would lead to absurd results . . . or would thwart the obvious purpose of the statute . . . .'" *In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643 (1978) (quoting *Comm'r v. Brown*, 380 U.S. 563, 571 (1965)); *see Secretary of Labor, Mine Safety & Health Admin. v. National Cement Co. of Cal., Inc.*, 494 F.3d 1066, 1069 (D.C. Cir. 2007); *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1088 (D.C. Cir. 1996). For the same reason, the court owes no deference to the Department's interpretation of § 608c(17)(G) in this litigation; even had it been set forth by the Secretary as part of the rulemaking, it fails at *Chevron* step one. Applying "traditional tools of statutory construction" the court must reject the construction as contrary to clear congressional intent. *Chevron*, 467 U.S. at 842-43.

In order to avoid the absurd result of an impossible instruction to the Secretary, § 608c(17)(G) must be read to allow the Secretary an opportunity to determine and consider producers' feed and fuel costs after the evidentiary record is closed. The rulemaking record for the *Interim Rule* does not indicate when the Secretary's review and deliberation took place, but for § 608c(17)(G) to be implemented in a reasoned manner, a "hearing" would be tied to the conclusion of the rulemaking, marked here by June 20, 2008 publication of the *Tentative Decision*. So understood, because the Secretary had not concluded the rulemaking for the *Interim Rule* when the 2008 Act went into effect on May 22, 2008, the Secretary was obligated to follow the requirements of § 608c(17)(G).

**IV.**

The 2008 amendment to the AMAA requires the Secretary to (i) determine the average monthly feed and fuel costs of dairy producers "in the relevant marketing area;" (ii) "consider the most recent monthly feed and fuel price data available" in arriving at that determination; and (iii) "consider those prices in

determining whether or not to adjust make allowances." 7 U.S.C. § 608c(17)(G)(i)-(iii). Here, we part ways with the producers. Their contention that the Secretary failed to carry out these obligations is belied by the rulemaking record.

**A.** The record shows that the Secretary determines monthly feed and fuel costs (as well producers' other major costs) as a matter of course. During the evidentiary hearing, the ALJ took official notice of *Agricultural Prices* reports stretching back several years and up to the date of the hearing. These monthly and annual reports, prepared by the Department's National Agricultural Statistics Service, use extensive sampling to compute the nationwide average prices paid by and to farmers for the inputs and outputs of farming. *See, e.g.*, NAT'L AGRIC. STATISTICS SERV., DEPT. OF AGRIC., AGRIC. PRICES 26 (May 2008).[8] Included are the prices paid for feed, fuel, and a variety of other inputs such as machinery and rent, as well as a ratio of the cost of feed to milk. *Id.* 28. These categories are broken down into subcategories and compared to previous months, years, and baseline and parity costs. *Id.* 28-29. Given these extensive computations by the Department in the rulemaking record, there can be no doubt the Secretary determined producers' feed and fuel costs, even though the proposed rule did not explicitly purport to do so in fulfillment of the requirements of § 608c(17)(G)(i), or indeed mention that provision at all. *See also Interim Rule*, 73 Fed. Reg. 35,307 (citing AGRIC. MKTG. SERV., U.S. DEP'T OF AGRIC., ECONOMIC ANALYSIS: CLASS III AND IV PRICING FORMULAS (2008)).

The Secretary complied as well with his obligation to determine those costs in "the relevant marketing area," § 608c(17)(G)(i). That provision is ambiguous because it does

---

[8] *Available at* http://usda.mannlib.cornell.edu/MannUsda/ viewDocumentInfo.do?documentID=1002.

not define "relevant." The Department determines the nationwide average for producers' monthly feed and fuel costs in the *Agricultural Prices* reports. The producers contend that cannot satisfy the Secretary's obligations to determine costs "in the relevant marketing area," and the Secretary must instead compute separate costs for each national marketing area as those areas are defined in Department regulations. *See, e.g.*, 7 C.F.R. § 1001.1 (2008) (defining "Northeast Marketing Area" to include certain states and counties of other states). However, as the Department points out, the Secretary determined years ago that Class III and IV "dairy products can and do compete on a national market basis," and the value of milk used for Class III and IV products is thus driven by this national market. *Milk in the New England and Other Marketing Areas: Amplified Decision*, 59 Fed. Reg. 42,422, 42,424 (Aug. 17, 1994). In the *Tentative Decision*, the Secretary reiterated that because those products "compete in a national marketplace," the data considered in setting make allowances must likewise be nationwide in scope. 73 Fed. Reg. 35,325. In using the term "relevant marketing area," Congress did not indicate an intention to forbid that long-standing practice, but instead to invoke the Secretary's expertise. Given the broad statutory phrase, it was reasonable for the Secretary to determine producer costs on a nationwide basis, where he has determined the nationwide market *is* the relevant area.

The text of § 608c(18) differs very slightly in structure on this point from that of § 608c(17)(G). It provides the Secretary must fix prices to reflect costs and conditions "in the market area to which the . . . [milk marketing order or amendment] . . relates." *See supra* note 7. Assuming that obligation extends to this rulemaking, the Secretary has complied for the same reasons he has complied with § 608(17)(G)(i).

**B.** The Secretary also met his obligation to consider "the most recent" price data available when determining the producers' costs. 7 U.S.C. § 608c(17)(G)(ii). The ALJ took official notice of the monthly *Agricultural Prices* reports either through the end of 2007 or up through the date of the post-hearing briefing – in either event up to or past the close of the evidentiary record. The producers contend this data was too old to qualify as "the most recent monthly . . . data available," *id*., because the evidentiary hearing concluded about one year before the *Tentative Decision* was published. However, § 608c(17)(G)(ii) does not define "most recent monthly feed and fuel price data available." The court would normally defer to a reasonable definition by the Secretary, s*ee Chevron*, 467 U.S. at 843, but the Secretary did not advance an interpretation in the rulemaking, nor address the issue in his brief to this court. The court may readily conclude, upon reading § 608c(17)(G) as a whole, *see supra* at [24-25], that the most reasonable interpretation is that when "determining" feed and fuel costs, the Secretary must use the most recent data available as of the close of the evidentiary record. So read, the Secretary complied by using up-to-date data in compiling the figures in *Agricultural Prices*, *see, e.g.*, AGRIC. PRICES 26 (May 2008), and in taking official notice of the most recent issue of that report as of the close of the evidentiary period.

The producers offer a different reading of the statute which would require the Secretary to consider "the most recent . . . data available" as of the time the proposed rule is published (here, the *Tentative Decision* of June 20, 2008). But § 608c(17)(G)(ii) requires consideration of the most recent data "available," not the most recent data conceivable, and at some point the Secretary must stop receiving new evidence and review the rulemaking record. Time is also required to draft and publish the proposed rule. This is true even though the producers point out that the Secretary accepted a report from the state of California in

November 2007, after the record had closed. *See Tentative Decision*, 73 Fed. Reg. at 35,324 n.1. That the Secretary chose to reopen the record to accept new evidence on a single point does not indicate that he would be obliged to do so by § 608c(17)(G)(ii) in order to have the most recent data "available." Nothing in the 2008 Act indicates Congress intended to impose an unworkable obligation on the Secretary to reopen the record repeatedly to receive new data during the process of "determin[ing]" and "consider[ing]." As there must be a cutoff, the court has no basis on this record to fault a cutoff date of the close of the evidentiary record, one year before the Interim Rule was issued. Although it is conceivable that delay in publishing a proposed rule until long after the record closed could be inconsistent with the requirement to consider the "most recent data available," the producers show no prejudice as a result of the Secretary's failure to consider cost data available on June 20, 2008. *See City of Portland v. EPA*, 507 F.3d 706, 717 (D.C. Cir. 2007); 5 U.S.C. § 706.

**C.** With regard to the Secretary's obligation to "consider [producers' feed and fuel] prices in determining whether or not to adjust make allowances," 7 U.S.C. § 608c(17)(G)(iii), the Secretary explicitly addressed these costs in promulgating the *Interim Rule*:

> In the aggregate, the costs of producing milk are reflected in the supply and demand conditions for the dairy products. When the supply of milk is insufficient to meet the demand for Class III and Class IV products, the prices for these products increase as do regulated minimum milk prices paid to dairy farmers because the milk is more valuable and this greater milk value is captured in the pricing formulas. Dairy farmers face no regulatory minimums in their costs and face no

regulated minimum payment obligation in the way that regulated handlers must pay dairy farmers for milk.

73 Fed. Reg. at 35,324. The Secretary contrasted these producers costs, reflected in market pricing, with handlers' costs of manufacturing:

> The ability of a manufacturer to offset cost increases are limited by the level of make allowances in the Class III and Class IV price formulas. Manufacturing processors are charged the [Federal Milk Marketing Order] minimum price for producer milk used to produce Class III and Class IV products. However, plant manufacturing cost increases may not be recovered because Class III and Class IV product-price formulas use make allowances that are fixed regardless of market conditions and change only by regulatory action. Simply put, when manufacturing cost increases result in costs higher than those provided by the formula make allowance factors, the value of milk used to make those products may be over-valued.

*Id.* at 35,323. The Secretary concluded that it was therefore necessary to increase make allowances to reflect increases in the manufacturing costs incurred by handlers as shown in the record evidence. *Id.* at 35,323-4.

In sum, the Secretary considered the costs to producers, but reasoned that those costs could be recouped through market mechanisms. The make allowances, by contrast, represent the costs of handlers and are the only mechanism through which manufacturers' costs can be recouped under the pricing formulas. The Secretary concluded it was necessary to increase make allowances to reflect handlers' increased costs. Although the Secretary increased make allowances and thereby decreased the

amount received by producers for a given market price, his well-reasoned analysis in the rulemaking record constitutes "consider[ing producers' feed and fuel] prices in determining whether or not to adjust make allowances," § 608c(17)(G)(iii).

**V.**

Although we hold that the producers may challenge the Secretary's decision in the *Interim Rule* to increase make allowances under the APA, and they correctly contend the Secretary was required to consider their costs for feed and fuel in deciding whether or not to amend make allowances, for the reasons set forth in Part IV they have shown no likelihood of success on the merits of their contention the Secretary exceeded his powers by failing to consider those costs. Thus, this court need not proceed to review the other three preliminary injunction factors and the district court's balancing of factors. *See Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006). The denial of the preliminary injunction is therefore affirmed.

On interlocutory review of petitions for injunctive relief, this court may reach the merits of a claim "inextricably bound up" with the issues on appeal. *Hartman v. Duffey*, 19 F.3d 1459, 1464 (D.C. Cir. 1994) (quoting 16 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3921 p.17 (1977)). As the Supreme Court has observed, "Review of a preliminary injunction 'is not confined to the act of granting [or denying] the injunctio[n], but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of [the] bill, and if so, to direct a final decree dismissing it.'" *Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008) (quoting *City and County of Denver v. N.Y. Trust Co.*, 229 U.S. 123, 136 (1913)) (all but first alternations in original); *see also Deckert v. Independence Shares Corp.*, 311 U.S. 282, 287 (1940). Because there is an "insuperable objection" to the producers'

claims predicated on the Secretary's alleged failure to consider feed and fuel costs under the AMAA, 7 U.S.C. §§ 608c(17)(G) and 608c(18), those claims in their complaint must be dismissed for failure to state a claim. *Munaf*, 128 S. Ct. at 2220. We remand the case to the district court for further proceedings consistent with this opinion.

GRIFFITH, *Circuit Judge*, dissenting in part and concurring in the judgment in part: I write separately because I believe the Agricultural Marketing Agreement Act of 1937, Pub. L. No. 75-137, 50 Stat. 246, precludes judicial review of the producers' claims.

The Administrative Procedure Act grants a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702 (2006). It withdraws that cause of action "to the extent that . . . statutes preclude judicial review." *Id.* § 701(a)(1). Preclusion may be found in the express language of a statute or in "the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). "[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded." *Id.* at 349.

The Act expressly provides only to handlers, and no one else, a right to petition the Secretary of Agriculture for review of a marketing order and to obtain judicial review of the Secretary's ruling in response. 7 U.S.C. § 608c(15) (2006). The majority concludes nevertheless that producers have a right to judicial review because, unlike the consumers in *Block*, they play an "active role . . . during the rulemaking process," Maj. Op. at 12. But that does not mean Congress intended producers to be afforded judicial review for any complaint they might have with a marketing order.[1] To the

---

[1] The majority purports to limit its grant of judicial review to cases where producers claim a violation of their definite and personal rights. *See* Maj. Op. at 15, 20. But the fact that producers have a "definite and personal" right at stake in the contested order, as they

contrary, their important role at the agency level explains why Congress withheld judicial review from them. No marketing order or amendment may issue without the approval of two-thirds of the affected producers (measured either by number or by volume of milk produced). *See* 7 U.S.C. § 608c(8)–(9). Producers can veto a proposed order for any reason; a court can only overturn an order if the Secretary has acted arbitrarily, capriciously, or contrary to law, *see* 5 U.S.C. § 706. The producer referendum is a far more powerful tool to challenge an action by the Secretary than the deferential review of a judicial forum. Ordinarily, producer interests will not, as the majority fears, "go unvindicated" without the availability of judicial review, Maj. Op. at 13. By contrast, Congress gave handlers a judicial remedy because they may vote on, but cannot block, a marketing order. An order or amendment may issue if fifty percent of the affected handlers vote to approve it. But if the handler referendum fails, the Secretary can nonetheless issue the order if he determines that the handlers' disapproval prevents the effectuation of the Act's policy and that the order is necessary to implement that

---

no doubt have in this case, tells us only that they have statutory (as well as constitutional) standing. It does not tell us whether Congress has precluded them from enforcing this definite and personal right in court. *See Stark v. Wickard*, 321 U.S. 288, 306 (1944) ("[E]ven where a complainant possesses a claim to executive action beneficial to him . . . it does not necessarily follow that actions of administrative officials, deemed by the owner of the right to place unlawful restrictions upon his claim, are cognizable in appropriate federal courts of first instance."); *Block*, 467 U.S. at 351 (explaining that the *Stark* producers' "definite and personal rights" gave them "standing to object to the administration of the settlement fund," but that this "standing could not by itself ensure judicial review of the Secretary's action at their behest"); *id.* at 353 n.4 (finding no need to address the constitutional and statutory "standing issues" because judicial review was precluded).

policy. *See* 7 U.S.C. § 608c(8)–(9). No similar override is available if the producers vote down the proposed order.

In some cases, however, the producer referendum is not an adequate forum in which to challenge unlawful actions of the Secretary. As the Court noted in *Stark v. Wickard*, 321 U.S. 288 (1944), the producers' veto power "cannot protect minority producers against unlawful exactions which might be voted upon them by majorities." *Id.* at 307. If the Secretary's proposed action would benefit some producers at the expense of others, there is a risk that the majority producers will exploit the referendum process to approve measures in marketing orders that discriminate against minority producers. In these instances, judicial review is available for the minority producers. For example, the minority producers in *Stark* challenged a provision that required the market administrator to deduct a certain amount from the money paid by milk handlers before distributing it to producers. The deducted amount would then be paid only to producers who were members of cooperatives. *See id.* at 300–01. By sanctioning higher payments to producer cooperatives and lower payments to independent producers, this provision threatened the statutory objective of producer equality. Because the producer cooperatives had sufficient voting power to control the outcome of the referendum regardless of the lawfulness of the provision, there was no adequate forum in which the minority producers could challenge the provision as unlawful. And without judicial review for their claim, no group could be "relied upon to challenge agency disregard of the law," *Block*, 467 U.S. at 351.

The majority reads *Stark* to require judicial review of all claims by producers. But *Block* emphasized that the structure of the Act demonstrates Congress's intent "that judicial review of market orders issued under the Act ordinarily be

confined to suits brought by handlers," 467 U.S. at 348. The Court viewed the result in *Stark* as a limited exception applicable in "certain" cases, *id.* at 351, when judicial review is "necessary to ensure achievement of the Act's most fundamental objectives," *id.* at 351–52. When divergent producer interests threaten the ability of minority producers to use the forum provided by the Act—the referendum—judicial review is permitted to safeguard the primary statutory objective: "to ensure that the benefits and burdens of the milk market are fairly and proportionately shared by all dairy farmers," *id.* at 342; *see also* 7 U.S.C. § 602 (declaration of statutory policy). Judicial review of orders and amendments that discriminate between producers ensures that the destabilizing producer competition targeted by the Act, *see Block*, 467 U.S. at 343, does not infect the milk marketing orders themselves.

Permitting judicial review of producers' claims in this narrow set of circumstances is consistent with our precedent and that of other circuits. The cases cited by the majority in support of a more general grant of judicial review for producers each involved divergent producer interests comparable to the circumstances in *Stark*. *See Alto Dairy v. Veneman*, 336 F.3d 560 (7th Cir. 2003) (Wisconsin producers who sold milk in Mideast region challenged amendment of Mideast pooling provision adopted without notice to them); *Minn. Milk Producers Ass'n v. Madigan*, 956 F.2d 816 (8th Cir. 1992) (producers outside marketing area, who could not vote on the challenged order, argued that it stimulated overproduction in other areas); *Farmers Union Milk Mktg. Coop. v. Yeutter*, 930 F.2d 466 (6th Cir. 1991) (rural producers challenged location adjustments that favored producers closest to cities); *Suntex Dairy v. Bergland*, 591 F.2d 1063 (5th Cir. 1979) (independent milk producers challenged bloc voting by large producer cooperative);

*Dairylea Coop., Inc. v. Butz*, 504 F.2d 80 (2d Cir. 1974) (recent market entrant challenged provision resulting in lower prices for newly entering producers); *Blair v. Freeman*, 370 F.2d 229 (D.C. Cir. 1966) (distant producers challenged "nearby differential" in price that advantaged producers closest to New York City); *cf. Pescosolido v. Block*, 765 F.2d 827 (9th Cir. 1985) (prohibiting judicial review of orange growers' claim that Secretary was not ensuring parity prices, an interest common to all growers).

The difference between this case and those—the one that "eludes" the majority, Maj. Op. at 17—is that the producers here had an adequate forum in which to challenge the Secretary's actions because the new make allowances treat all producers uniformly. Because the producers' interests here are all aligned in the same direction, the risk that existed in *Stark* of larger producers capturing the referendum process to unlawfully disadvantage the minority is not present. The producer referendum thus served its purpose as a check on the Secretary's statutory authority. Judicial review is not necessary to vindicate the objectives of the Act, and we should defer to the congressional preference—expressed in the Act's structure—to preclude that review. I would affirm the district court's ruling that judicial review is precluded and remand with direction to dismiss the producers' claims.