# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 22, 2010        Decided August 3, 2010

No. 09-5286

NICK KORETOFF, DOING BUSINESS AS NICK KORETOFF
RANCHES, ET AL.,
APPELLANTS

v.

TOM VILSACK, UNITED STATES SECRETARY OF AGRICULTURE,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01558-ESH)

———

*John H. Vetne* argued the cause for appellants. With him
on the briefs were *Susan Silber* and *Kenneth Sigman*.

*Michael P. Abate*, Attorney, U.S. Department of Justice,
argued the cause for appellee. With him on the brief were
*Tony West*, Assistant Attorney General, *Channing D. Phillips*,
Acting United States Attorney, and *Michael S. Raab*,
Attorney.

Before: HENDERSON, GRIFFITH, and KAVANAUGH,
*Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, with whom *Circuit Judge* GRIFFITH joins.

Opinion dissenting in part filed by *Circuit Judge* HENDERSON.

KAVANAUGH, *Circuit Judge*: A 2007 Department of Agriculture rule mandates that almonds produced in the United States be pasteurized or chemically treated to prevent salmonella outbreaks. That requirement largely eliminates the ability of California almond producers to sell raw almonds – and therefore harms those producers' economic well-being. At the same time, because of what the California producers view as a statutory loophole, foreign almond producers are still able to sell raw almonds in the United States. Several California almond producers filed suit. They argue that the 2007 rule is arbitrary and capricious under the Administrative Procedure Act, exceeds the agency's statutory authority, and violates various APA procedural requirements.

The Government responds not on the merits, but by contending that the California producers should not even be allowed into court to advance their claims. The Government does not deny that the producers suffered an injury-in-fact and have standing under Article III of the Constitution. Rather, according to the Government, the Agricultural Marketing Agreement Act of 1937 precludes almond producers from obtaining judicial review of the 2007 rule. We disagree with the Government. The AMAA does not expressly bar producers' suits. And in light of the decisions of the Supreme Court and this Court, we conclude that the AMAA does not implicitly bar the producers' claims. *See Block v. Community Nutrition Institute*, 467 U.S. 340 (1984); *Stark v. Wickard*, 321 U.S. 288 (1944); *Arkansas Dairy Cooperative*

*Association v. U.S. Department of Agriculture*, 573 F.3d 815 (D.C. Cir. 2009). We therefore reverse the contrary judgment of the District Court, which was issued before and thus without the benefit of our recent on-point decision in *Arkansas Dairy*.

Three of the 10 California almond producers involved in this appeal are also retailers who sell their own almonds directly to consumers. Those three plaintiffs mount an additional legal challenge to separate Department of Agriculture regulations that restrict retail sales by such producers. We agree with the District Court that the AMAA does not preclude plaintiffs from raising such claims but does require plaintiffs to exhaust their administrative remedies with the Department of Agriculture before bringing the claims to court. We therefore affirm the District Court's judgment as to those claims.

I

A

This case is about the almond market. That market consists of growers (whom we will refer to as "producers"), handlers, retailers, and consumers of almonds. Producers grow the almonds and sell them to handlers. Handlers buy the almonds from the producers, process and package the almonds, and then sell them to retailers. Retailers sell almonds to consumers. Some producers also sell directly to consumers, bypassing the intermediaries.

This case involves the Agricultural Marketing Agreement Act of 1937, a landmark piece of legislation that arose out of the farming catastrophe during the Great Depression. The AMAA authorizes the Secretary of Agriculture to promulgate

marketing orders that regulate the production and sale of agricultural commodities. 7 U.S.C. §§ 601-674. It seeks to "avoid unreasonable fluctuations in supplies and prices" of various farm commodities. *Id.* § 602(4). The AMAA is currently applied to about three dozen agricultural commodities, such as milk, avocados, oranges, and peanuts. Agricultural marketing orders may dictate the "total quantity" of a regulated commodity sold in a particular region, as well as the "grade, size, or quality thereof." *Id*. § 608c(6)(A).

Before promulgating a marketing order under the AMAA, the Secretary of Agriculture must consult with producers and handlers of the commodity in question. The AMAA requires that a marketing order receive the approval of two-thirds of producers in a region (measured by number of producers or volume). For some purposes, the AMAA also requires the approval of a majority of handlers (measured by volume). *Id*. § 608c(8)-(9).

The AMAA expressly allows handlers to sue and obtain judicial review of marketing orders, but requires them first to exhaust specified administrative remedies. *Id*. at § 608c(15)(A). The AMAA is silent about a right to sue or about exhaustion of administrative remedies for producers, retailers, or consumers.

B

In 1950, acting pursuant to the AMAA, the Secretary of Agriculture promulgated the California Almond Marketing Order, 7 C.F.R. pt. 981. The Almond Order has been amended often in the 60 years since. Among other things, the Order sets quality standards for commercially sold almonds and regulates the quantity of almonds that may be sold in a given year.

In the wake of two salmonella outbreaks in 2001 and 2004, the Secretary in 2007 issued a new almond rule under the Almond Order. Almonds Grown in California; Outgoing Quality Control Requirements, 72 Fed. Reg. 15,021, 15,034 (Mar. 30, 2007). This rule is now codified at 7 C.F.R. § 981.442(b).

The new rule required the use of one of several approved methods for reducing salmonella bacteria in almonds, all involving either pasteurization or chemical treatment of nearly all almonds sold. 7 C.F.R. § 981.442(b).

C

The current dispute arises primarily because the 2007 rule had the effect of largely eliminating the domestic *raw* almond market. The 10 plaintiffs still involved in the case are California almond producers who grew raw almonds for domestic U.S. consumption. Because the 2007 rule devastated the market for domestic raw almonds, those producers allege that they lost both their expected profits from the premium price paid for raw almonds and the return on investments they had made in production equipment. At the same time, the 2007 rule had no impact on foreign almond producers, who are not subject to Department of Agriculture regulation and are still permitted to import raw almonds into the United States.

Three of the 10 producers are also retailers who sell almonds directly to consumers. These producer-retailers also challenged separate Department of Agriculture restrictions on how and where they could sell almonds at retail. Those restrictions date back to 1985. *See* 50 Fed. Reg. 30,264 (July 25, 1985) (codified at 7 C.F.R. § 981.413).

A group of California almond producers sued in U.S. District Court, arguing that various aspects of the Secretary's 2007 rule were arbitrary and capricious under the APA, exceeded statutory authority, and violated certain APA procedural requirements. The District Court dismissed plaintiffs' suit. *See Koretoff v. Vilsack*, 601 F. Supp. 2d 238 (D.D.C. 2009). It reasoned that the AMAA implicitly precludes producers from suing to challenge regulations issued under the AMAA. The Court ruled that the separate claims by the producer-retailers were not precluded but should be dismissed for failure to exhaust administrative remedies. *See id.* at 241-44.

Plaintiffs appeal on both issues. Our review of the legal questions is de novo. In resolving the question of AMAA preclusion, it bears mention that the District Court rendered its decision before *Arkansas Dairy Cooperative Association v. U.S. Department of Agriculture*, 573 F.3d 815 (D.C. Cir. 2009), a recent opinion of this Court that helps chart our path here.

II

A

The Administrative Procedure Act establishes a cause of action for those "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702; *see Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967). That statutory right to judicial review does not apply, however, when "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). Whether a statute precludes judicial review of agency action, the Supreme Court has said, is a question of congressional intent, which is determined from

the statute's "express language," as well as "from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984); *see also Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, No. 08-861, slip op. at 8 (U.S. June 28, 2010); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994).

In assessing whether a plaintiff's suit is precluded by statute, we must determine not only whether "Congress precluded all judicial review" of the agency action but also whether Congress "foreclosed review to the class to which the [plaintiff] belong[s]." *Block*, 467 U.S. at 345-46 (*quoting Barlow v. Collins*, 397 U.S. 159, 173 (1970) (Brennan, J., concurring in result and dissenting)).

B

The Supreme Court and this Court have applied those preclusion principles in three important cases arising under the Agricultural Marketing Agreement Act: *Stark v. Wickard*, 321 U.S. 288 (1944); *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984); and *Arkansas Dairy Cooperative Association v. U.S. Department of Agriculture*, 573 F.3d 815 (D.C. Cir. 2009). As we will explain, those cases together indicate that the AMAA does not preclude producer suits challenging rules and orders issued under the AMAA.

In *Stark v. Wickard*, the Supreme Court held that milk producers could sue to challenge a milk marketing order. 321 U.S. 288 (1944). The Court acknowledged that the AMAA granted "no direct judicial review" to producers. *Id.* at 307-08. The Court noted, however, that producers had a "financial interest" in aspects of the marketing order. *Id.* at 308. And the Court stated that it was "not to be lightly

assumed that the silence of the statute bars from the courts an otherwise justiciable issue." *Id*. at 309.

The Supreme Court decided *Stark* in 1944 – before the 1946 passage of the Administrative Procedure Act. Pub. L. No. 79-404, 60 Stat. 237 (codified at 5 U.S.C. § 701 *et seq*.). The timing of the *Stark* decision only adds, however, to its precedential force. If anything, the subsequent enactment of the APA, which created a generic cause of action to challenge agency action, fortifies *Stark*'s open-the-courthouse-door-to-producers ruling. Indeed, passage of the APA largely resolved the main concern that had been articulated in Justice Frankfurter's dissent in *Stark* – namely, that "creat[ing] a judicial remedy for producers when the statute gave none is to dislocate the Congressional scheme of enforcement." 321 U.S. at 317 (Frankfurter, J., dissenting).

The Supreme Court next addressed AMAA preclusion some 40 years later in *Block v. Community Nutrition Institute*. There, the Court held that the AMAA precludes judicial review of challenges brought by *consumers* to marketing orders. Allowing suit by consumers would mean virtually every American could challenge every agricultural marketing order. As revealed at oral argument in the *Block* case, that hard-to-fathom result was of great concern to the Supreme Court and informed its assessment of Congress's intent on whether such suits were precluded by the AMAA. *See* Tr. of Oral Arg. at 32, *Block*, 467 U.S. 340 (No. 83-458) (raising question whether all of the individual Justices could sue as consumers of milk). In its opinion addressing whether consumer suits were precluded, the *Block* Court explained that the AMAA "contemplates a cooperative venture among the Secretary, handlers, and producers." 467 U.S. at 346. Consumers, by contrast, were assigned no active role in the regulatory scheme. *Id.* at 346-47. The Court determined that

the "structure of this Act indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id*. at 347. The Court also noted that Congress had required handlers to exhaust administrative remedies before suing. Allowing consumers to bring suit without exhausting administrative remedies "would provide handlers with a convenient device for evading" that exhaustion requirement by either recruiting a consumer as a partner in litigation or, in the case of handlers who were also consumers, suing in their capacity as consumers. *Id*. at 348. The Court reasoned that Congress likely would not have intended to allow such easy circumvention of the exhaustion requirement, and thus likely did not intend for consumers to be able to challenge agricultural marketing orders in court.

Importantly, in barring consumer suits, the *Block* Court expressly reaffirmed *Stark*'s holding with respect to producer suits. It found that "preclusion of consumer suits is perfectly consistent" with the Court's "conclusion concerning producer challenges in *Stark v. Wickard*." *Id*. at 352. In discussing *Stark*, the *Block* Court stated that "[j]udicial review of the producers' complaint" in *Stark* was "necessary to ensure achievement of the Act's most fundamental objectives – to wit, the protection of the producers of milk and milk products." *Id*. The *Block* Court echoed then-Judge Scalia's opinion in this Court, in which he had similarly concluded that consumers could not bring challenges to agricultural marketing agreements, even though producers could. Judge Scalia had reasoned that the "direct beneficiaries of milk marketing orders under the [AMAA] are milk producers. Even before adoption of the APA, the courts found a congressional intent to permit them to sue." *Community Nutrition Inst. v. Block*, 698 F.2d 1239, 1257 (D.C. Cir. 1983) (Scalia, J., concurring in part and dissenting in part).

Notably, in distinguishing *Stark*, the *Block* Court largely followed the approach that the Government had advocated to the Court. The Government argued that "producers and consumers stand on very different ground" and have "generally antagonistic" interests. Gov't Br. at 31, *Block*, 467 U.S. 340 (No. 83-458). The Government added that "it would be anomalous to conclude that Congress meant to foreclose all producer challenges to the market order program; indeed, Congress appears to have contemplated producer suits . . . ." *Id.* at 31-32. At oral argument, the Government further stated that "this statute was passed expressly for the benefit of producers." Tr. of Oral Arg. at 12, *Block*, 467 U.S. 340 (No. 83-458). The Government's counsel went so far as to suggest that barring producer suits might be unconstitutional: "One other difference, Justice White, between consumers and producers is that basically the market orders are government-ordered contracts between handlers and producers; and it would be quite unfair and perhaps even unconstitutional to say that one party to the contract, the handler, can sue, but the other party to the contract, whose personal proprietary rights are affected, can't sue because Congress didn't mention them. The same thing is not true of consumers." *Id.* at 15.[1]

As our Court has recently explained, *Stark* and *Block* together indicate that producers can sue to challenge agricultural marketing orders, but consumers cannot. *See*

---

[1] Judge Henderson's dissent highlights a sentence in *Block* where the Court said that judicial review would "ordinarily be confined to suits brought by handlers." Dissenting Op. at 1, 3 (quoting *Block*, 467 U.S. at 348). But in *Arkansas Dairy* we analyzed that sentence from *Block* and explained that, in context, the Court was simply distinguishing handlers from consumers, and that a contrary reading would require us to ignore *Stark*. *See Arkansas Dairy*, 573 F.3d at 823-24.

*Arkansas Dairy*, 573 F.3d 815 (D.C. Cir. 2009). In *Arkansas Dairy*, we relied heavily on *Stark* in permitting milk producers to bring a challenge to a milk marketing order promulgated under the AMAA. We distinguished *Block*, reiterating that producers "occupy a different status under the AMAA from that of consumers." *Id.* at 823. We said that the *Block* Court had "contrasted" the role of consumers in the statutory scheme "with the role of handlers and producers." *Id.* at 822; s*ee also id.* at 834 (Griffith, J., dissenting in part and concurring in judgment in part) ("The majority reads *Stark* to require judicial review of all claims by producers.").

The Government seems to suggest that the statutorily required approval of two-thirds of producers for a marketing order evinces a congressional intent to bar all producers' suits. In light of *Arkansas Dairy* and the relevant Supreme Court precedents, the Government's intimation is incorrect. As we explained in *Arkansas Dairy*, some minority of producers – by definition, up to one-third of all producers in a region – could vote against the promulgation of a marketing order but nonetheless would be unable to prevent the Secretary from promulgating the order. We therefore rejected the argument that the opportunity to participate precludes suit. In so ruling, we quoted *Stark*, which had stated: "a mere hearing or opportunity to vote cannot protect minority producers against unlawful exactions which might be voted upon them by majorities." *Id.* at 825 (majority opinion) (quoting *Stark*, 321 U.S. at 307). We added that *Stark* "evidences a focus on ensuring a judicial forum for producers who allege they are harmed by an illegal order, *regardless of their right to vote on that order*." *Id.* at 826 n.5 (emphasis added).[2]

---

[2] We note that the Government's suggestion here is contrary to its argument to the Supreme Court in *Block*. In explaining why producer suits were allowed, the Government there stated that

To the extent legislative history is relevant here, the legislative debates during passage of the AMAA's precursor also support our analysis in *Arkansas Dairy*. Representative Andresen of Minnesota, a member of the House Committee on Agriculture, pointed to judicial review as the remedy for the vindication of minority producer interests: "Mr. DONDERO. The point I make is whether or not the minority in that kind of a case would have any voice of protest in order to get them from under the agreement in which they did not care to join. Mr. ANDRESEN. Personally I think they would have the best kind of a day in court if they came before the court and presented their side of the question." 79 CONG. REC. 9479 (1935).

It also bears mention that the two-thirds of producers needed for approval of almond orders may be measured either by *number of producers* or by *volume of almonds sold*. 7 U.S.C. § 608c(9)(B)(i)-(ii). It is thus easy to envision a scenario in which a few large almond producers approve a marketing order that disadvantages a relatively large group of small almond producers, either to run the latter out of business or simply because the two groups have divergent interests. That example further illustrates why Congress's decision to require approval of two-thirds of producers does not indicate a congressional intent to bar all producers' suits.[3]

---

"[n]ot every producer is always going to be happy," acknowledging that this group would include "[a]ny one of the third who didn't vote for it." Tr. of Oral Arg. at 13, *Block*, 467 U.S. 340 (No. 83-458).

[3] In this case, moreover, producers did not vote on promulgation of 7 C.F.R. § 981.442(b)'s salmonella rule. Rather, that regulation was promulgated pursuant to the authority of the California Almond Board – with the approval of the Secretary – to establish "such minimum quality and inspection requirements . . .

In sum, the precedents of the Supreme Court and this Court indicate that the AMAA does not preclude producer suits challenging rules and orders issued under the AMAA. As we also noted in *Arkansas Dairy*, moreover, our Court is not alone in reading *Stark* and *Block* to allow producers – but not consumers – to challenge such agency actions. Three of the four other circuits to consider the question have reached the same conclusion, finding that adopting the Government's "radical interpretation" of *Block* as precluding producers' suits "would effectively undermine the presumption in favor of judicial review that the Supreme Court has consistently reaffirmed." *Farmers Union Milk Marketing Coop. v. Yeutter*, 930 F.2d 466, 474 (6th Cir. 1991) (Boggs, J.); *see also Alto Dairy v. Veneman*, 336 F.3d 560, 567-69 (7th Cir. 2003); *Minn. Milk Producers Ass'n v. Madigan*, 956 F.2d 816, 817-18 (8th Cir. 1992). Only the Ninth Circuit has reached a different conclusion, in a decision rendered 25 years ago over the disagreement of Judge Wiggins. *See Pescosolido v. Block*, 765 F.2d 827, 831-32 (9th Cir. 1985).

C

The Government tries to get around the precedents by contending that *Stark*, *Block*, and *Arkansas Dairy* dealt with *milk*, rather than *almonds*, and that the almond industry raises different issues.

---

as will contribute to orderly marketing or be in the public interest" and to "establish rules and regulations necessary and incidental." 7 C.F.R. § 981.42(b); *see* Almonds Grown in California; Outgoing Quality Control Requirements and Request for Approval of New Information Collection, 71 Fed. Reg. 70,683, 70,687 (proposed Dec. 6, 2006). Because such rules are not amendments to the Order, no producer referendum was held before promulgation of the salmonella rule.

The Government's attempted distinction of the precedents goes as follows: In the almond industry, unlike in the milk industry, handlers' interests are identical to producers' interests. Therefore, according to the Government, almond handlers – who possess a statutory right to judicial review under the AMAA – can adequately represent the interests of almond producers in court.

The Government's argument finds no support in precedent and is flawed at a very basic conceptual level. The usual rule of administrative law is that an aggrieved party can sue to challenge agency action regardless of whether there might be some other aggrieved party who might raise the same challenge or seek the same relief. The Government's argument – handlers can sue and that's good enough for producers – is thus inconsistent with bedrock tenets of administrative law. We find no indication that Congress intended to depart from those principles when enacting the AMAA. *See Stark*, 321 U.S. at 308-10. It would be especially odd to rely on this kind of virtual or vicarious representation to bar producers from suing given that producers are the primary intended beneficiaries of the AMAA – a point noted by the Supreme Court in *Block*. 467 U.S. at 352 ("[j]udicial review of the producers' complaint [in *Stark*] was therefore necessary to ensure achievement of the Act's most fundamental objectives – to wit, the protection of the producers of milk and milk products."). This conclusion finds additional support in intervention cases, where we have stated that intervenors are not sufficiently protected by a mere congruence of interests with a party litigant. *See Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 737 (D.C. Cir. 2003). We see no reason for a different result here.

In any event, the Government's argument is also flawed on the facts. The Government makes too much of the distinction between the almond and milk industries. Even a cursory examination of the Almond Marketing Order shows how the interests of almond producers and handlers can diverge. The Almond Order requires, for example, that handlers maintain a certain quantity of almonds on hand as "reserves" at all times. *See* 7 C.F.R. §§ 981.46, 981.50. The required quantity is determined by regulation. *Id.* § 981.49(e). Almond producers and almond handlers may have different preferences: Almond handlers may prefer a smaller reserve, to avoid the cost of purchasing reserve almonds, whereas almond producers might prefer a larger reserve in order to guarantee larger mandatory sales. Similarly, the Almond Marketing Order permits regulation of handlers' labeling of almond containers. *Id.* § 981.43. Handlers may disfavor such restrictions as imposing additional burdens upon them. Producers, however, might be inclined to support such regulation in some circumstances: Precise, accurate labeling might encourage repeat orders by customers. The Almond Order also imposes quality control regulations on handlers. *Id.* § 981.42. As with labeling, it is easy to see how handlers might chafe under such regulations, while producers might appreciate any refinement of the final product sold that did not come at their direct expense.

True, there will be some cases where the interests of almond producers and almond handlers overlap. But in others, they won't. And the Government has provided us with no workable way to determine when interests diverge in such a manner as to draw the line in precluding suit. The Government's theory – almond producers sometimes can sue and sometimes cannot – would produce a chaotic case-by-case determination of whether producers' and handlers' interests are aligned. This is a recipe for endless satellite

16

litigation. We declined to embark on such an endeavor in *Arkansas Dairy*, and we must do so again here.

III

Three of the 10 plaintiffs still involved in this case not only produce almonds, but also sell them directly to consumers. These producer-retailer plaintiffs argue that the AMAA does not authorize the Secretary of Agriculture to regulate retail sales. The statute and regulation together require these plaintiffs to exhaust their administrative remedies before bringing their claims to court. That is because the statute requires handlers to exhaust, and the regulations in turn define these producer-retailers as handlers because of where and how they sell almonds.

Plaintiffs retort that the regulation classifying them as handlers – and triggering the exhaustion requirement – is inconsistent with the AMAA. In other words, plaintiffs argue that the regulation improperly requires them to exhaust administrative remedies. But this broad-based challenge to the agency's exhaustion requirement is itself an argument that must be raised first to the agency. *Cf. Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 49-51 (1938) (party may not challenge agency's jurisdiction over it without exhausting administrative remedies); *Greater Detroit Res. Recovery Auth. v. EPA*, 916 F.2d 317, 323 (6th Cir. 1990) (exceptions to the exhaustion doctrine may not be "automatically invoked whenever a challenge to the scope of an agency's authority is raised") (quoting *Shawnee Coal Co. v. Andrus*, 661 F.2d 1083, 1093 (6th Cir. 1981)); *Deltona Corp. v. Alexander*, 682 F.2d 888, 893 (11th Cir. 1982) ("the agency ordinarily should be given the first opportunity to consider a challenge to its jurisdiction").

We therefore agree with the District Court's conclusion dismissing the claims of the three producer-retailer plaintiffs for failure to exhaust their administrative remedies with respect to their challenge to the Department's retail restrictions.

* * *

We reverse the judgment of the District Court with respect to the suit of the ten producers. Their claims can go forward. We affirm the District Court's judgment dismissing the claims of the three producer-retailers; those claims must be raised first to the Department of Agriculture.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting in part:

The Agricultural Marketing Agreement Act (Act or AMAA), 7 U.S.C. §§ 601 et seq., authorizes the United States Secretary of Agriculture (Secretary) to issue and amend agricultural marketing orders applicable to handlers of various agricultural commodities, including almonds. *Id*. § 608c(1)-(2). The Act expressly requires the Secretary to submit a proposed order for approval by the handlers and the producers—with the producers, but not the handlers, wielding veto power should two-thirds of them (by number or volume produced) fail to approve. *Id*. § 608c(8)-(9). While lacking a veto, the handlers can challenge a marketing order before the Secretary and then in district court. *Id*. § 608c(15). The Act provides no express right of review to any other party. In light of "this complex and delicate administrative scheme," the United States Supreme Court "think[s] it clear that Congress intended that judicial review of market orders issued under the Act ordinarily be confined to suits brought by handlers in accordance with 7 U.S.C. § 608c(15)." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 348 (1984)—with the single exception that a milk producer may challenge in court an order that infringes its statutory right under the Act to receive the guaranteed minimum milk price set by the Secretary, *see Stark v. Wickard*, 321 U.S. 288 (1944). Nonetheless, the majority maintains that as a matter of course "producers" as well "can sue to challenge agricultural marketing orders," Maj. Op. at 10, including the appellant almond producers. I throw my lot in with the Supreme Court. Almonds do not belong on the same shelf with milk.

As the district court observed, *Stark* carved out a "a narrow exception" to the general rule, noted in *Block*, that ordinarily only handlers (and not producers) may seek review of a marketing order. *Koretoff v. Vilsack*, 601 F. Supp. 2d 238, 244 (D.D.C. 2009) (citing *Stark*, *supra*). In *Stark*, the Supreme Court permitted a class of milk producers to challenge a marketing order that required the "settlement fund"

administrator to deduct from the fund's pooled payments a fee to be paid to milk producer co-operatives. The effect of the deduction was to reduce the minimum "blend" price paid to the milk producers from the fund.[1] The Court concluded that, although there was "no direct judicial review granted by [the Act] for the[] proceedings," the "authority for a judicial examination of the validity of the Secretary's action is found in the existence of courts and the intent of Congress as deduced from the statutes and precedents." 321 U.S. at 307-08. In particular, the Court determined that "[t]he statute and Order create a right in the producer to avail himself of the protection of a *minimum price* afforded by Governmental action"—a right "mandatory in character and obviously capable of judicial enforcement." 321 U.S. at 303 (emphasis added). Noting that "the challenged deduction reduces pro tanto the amount actually received by the producers for their milk," *id*. at 302, the Court explained that "[i]t is because every dollar of deduction comes from the producer that he may challenge the use of the fund," *id*. at 308.[2]

---

[1]Under the milk marketing regime, the Secretary fixes different minimum raw milk prices depending on the end-use to which a handler puts it (e.g, fluid milk, cream, ice cream). The payments are pooled in a settlement fund and, after certain administrative expenses are deducted, an average "blend price" is calculated which is the price each producer actually receives. *See Edaleen Dairy, LLC v. Johanns*, 467 F.3d 778, 779-80 (D.C. Cir. 2006). Thus, any deduction from the fund (such as the co-operative payment in *Stark*) reduces the price each producer is paid.

[2]The Court indicated that the availability of review for marketing orders is limited:

It is suggested that such a ruling puts the agency at the mercy of objectors, since any provisions of the Order may be attacked as unauthorized by each producer. To this objection there are adequate answers. The terms of the

3

In *Block*, as noted *supra*, the Court made clear that judicial review is "ordinarily . . . confined to suits brought by handlers in accordance with 7 U.S.C. § 608c(15)*." Block*, 467 U.S. at 348. The Court acknowledged that under *Stark*, "dairy producers could challenge *certain* administrative actions even though the Act did not expressly provide them a right to judicial review" but explained that the challenged deductions in *Stark* " 'reduce[d] pro tanto the amount actually received by the producers for their milk,' " thereby giving the producers "standing to object to the administration of the settlement fund." *Id*. at 351 (quoting *Stark*, 321 U.S. at 302) (emphasis added) (alteration in *Block*). "Though the producers' standing could not by itself ensure judicial review of the Secretary's action at their behest, the statutory scheme as a whole, the [*Stark*] Court concluded, implicitly authorized producers' *suits concerning settlement fund administration*." *Id*. (emphasis added) (internal citation omitted). The *Block* court noted that in *Stark* the handlers " '[could not] question the use of the fund, because handlers had no financial interest in the fund or its use' " and so, unless the producers were granted judicial review, there was " 'no forum' in which this aspect of the Secretary's actions could or would be challenged." *Id*. at 351-52 (quoting *Stark*, 321 U.S. at 309) (alteration added) (internal citation omitted).[3]

---

Order are largely matters of administrative discretion as to which there is no justiciable right or are clearly authorized by a valid act. *United States v. Rock Royal Co-op*., 307 U.S. 533 [(1939)]. Technical details of the milk business are left to the Secretary and his aides.

321 U.S. at 310.

[3]The majority asserts that considering whether the producers' and the handlers' interests coincide in a particular case "would produce a chaotic case-by-case determination." Maj. Op. at 15. But case-by-case determinations are the hallmark of administrative and judicial

In this Circuit's decisions permitting producers to challenge a marketing order, the injury to the producers was, as in *Stark*, an impairment of their statutory right to full payment, through the settlement fund, of the minimum price fixed by the Secretary for milk products. In *Blair v. Freeman*, 370 F.2d 229 (D.C. Cir. 1966), we entertained a challenge to a price deduction in the form of a travel distance variable based on the location of the milk producer's farm. We there concluded the appellant dairy producers had "standing to present their claim that the nearby differential provision exceeded the statutory power of the Secretary." *Id.* at 234. We explained: "Since this differential is payable out of the equalization pool, the deduction reduces pro tanto the amount actually received by producers for their milk. The appellants thus have standing to invoke the protection of equity to insure that their statutory right to minimum price protection is not being improperly diminished." *Id.* n.15 (citing *Stark*, 321 U.S. at 290, 302-310).

Most recently, in *Arkansas Dairy Cooperative Ass'n v. United States Department of Agriculture*, 573 F.3d 815 (D.C. Cir. 2009), the court again permitted milk producers to challenge reductions to the minimum price they received for milk. In *Arkansas Dairy*, the milk producers challenged the Secretary's interim rule that increased the "make allowance"—an amount which is intended to represent the costs to the handlers of making the end dairy products from raw milk and which is deducted from the end-use price before the blend price is computed. Relying primarily on *Stark*, the court held the milk producers could "bring suit under the APA to challenge the *Interim Rule,* which directly affect[ed] their blend prices

---

adjudications and the Supreme Court advocated just such an inquiry in *Block*. In this case the interests of untreated almond producers and of untreated almond handlers—both of whom will lose the profits they would otherwise earn from the sale of raw almonds—are indeed aligned.

through increased make allowances, even though the milk marketing orders w[ould] not directly affect the producer settlement fund." 573 F.3d at 827. We explained: "The producers are aggrieved, within the meaning of the APA, by the alleged diminution of their personal rights secured under the AMAA, the *Interim Rule* they challenge constitutes final agency action, and they seek non-monetary injunctive relief." *Id.* (citing 5 U.S.C. §§ 702, 704). The case paralleled *Stark* and *Blair*, the majority wrote, because the challenged rule "deduct[ed] funds from the value of milk before calculating the blend price guaranteed to producers, thus reducing, 'dollar for dollar,' the minimum price producers are guaranteed for their milk products.' " *Id.* at 825.[4]

---

[4]It was on this basis, in part, that *Arkansas Dairy* distinguished our earlier decision in *Benson v. Schofield*, 236 F.2d 719 (D.C. Cir. 1956), in which the court did find precluded a suit by Massachusetts dairy producers challenging a proposed order expanding the "Greater Boston Marketing Area" to subject milk from additional towns to its minimum prices. *Arkansas Dairy* points out that "in *Benson* the court was not addressing a diminution of producers' statutorily-guaranteed blend prices, as in *Stark, Blair*, and the instant case, but rather an order that increased the boundaries of a marketing area to cover a greater number of handlers, an action the court held did not infringe any statutory right possessed by the producers because only handlers were affected." 573 F.3d at 827 (citing *Benson*, 236 F.2d at 723). The *Benson* court in turn had distinguished *Stark* on a similar ground:

> [A]ppellees claim standing to vindicate a "legal wrong" because of language to be found in *Stark v. Wickard*. But there the Court pointed out: "It is because every dollar of deduction comes from the producer that he may challenge the use of the fund. The petitioners' complaint is not that their blended price is too low, but that the blended price has been reduced by a misapplication of money deducted from the producers' minimum price." We still come back to the proposition, as the *Stark* case points out, that absent

This case is nothing like *Stark* or its progeny. The commodity at issue here is not milk—as in *Stark*, *Blair* and *Arkansas Dairy*—but almonds. And the Act confers no statutory right on a producer to receive any payment for its almonds; nor does it empower the Secretary to fix their price, as it does for milk. The Act expressly authorizes the Secretary to regulate milk prices alone. *See Pescosolido v. Block*, 765 F.2d 827, 830 (9th Cir. 1985) ("Unlike the fixed minimum prices which must be established for milk . . . , *see* 7 U.S.C. § 608c(5)(A), the Secretary is *not* empowered to fix prices for any other commodities covered by the Act. Instead, he may only employ market controls, *see id*. § 608c(6), in an effort to 'effectuate the declared policy of' the Act" (quoting 7 U.S.C. § 608c(4))) (emphasis in original). Milk is *sui generis* in this respect as in so many others.[5] *As Block* observed, in *Stark*, "[j]udicial review of the producers' complaint was . . . necessary to ensure achievement of the Act's *most fundamental objectives*—to wit, the protection of the producers of milk and milk products." 467 U.S. at 351 (emphasis added). Protecting the market for raw almonds—by the appellants' own admission a "niche" market (albeit a "lucrative" one), Appellants' Br. 10—presents no such compelling necessity.[6]

_____

"*justiciable individual* rights," (italics ours) the detriment complained of is damnum absque injuria.

236 F.2d at 723.

[5]Milk is far more extensively regulated under the Act than the other covered commodities. *Compare* 7 U.S.C. § 608c(5) *with id* § 608c(6).

[6]All of the extra-Circuit cases the majority cites to support its position involved milk prices. *See* Maj. Op. at 13 (citing *Farmers Union Milk Marketing Coop. v. Yeutter*, 930 F.2d 466, 474 (6th Cir. 1991); *Alto Dairy v. Veneman*, 336 F.3d 560, 567-69 (7th Cir. 2003);

For the foregoing reasons, I respectfully dissent.[7]

---

*Minn. Milk Producers Ass'n v. Madigan*, 956 F.2d 816, 817-18 (8th Cir. 1992)). The only extra-Circuit case the majority cites as *contra* involved navel oranges. *See id*. (citing *Pescosolido*, 765 F.2d at 831-32.

[7]I concur in the majority's affirmance of the district court's dismissal of the three producer-retailers' claims for failure to exhaust administrative remedies.